# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **FORD MOTOR CREDIT COMPANY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CV-97-PT-2656-E** |
| ) | |
| **POLLOCK MOTOR CO., INC. f/k/a/** ) | |
| **POLLOCK FORD CO., INC.,** ) | |
| ) | |
| **Defendant, Counterclaimant &** ) | |
| **Third-Party Plaintiff** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **FORD MOTOR CREDIT CO. and** ) | |
| **FORD MOTOR CO., INC.** ) | |
| ) | |
| **Counterclaim Defendant &** ) | |
| **Third-Party Defendant.** ) | |

## MEMORANDUM OPINION

This cause comes to be heard upon counterdefendant Ford Motor Credit Company's (FMCC) motion for summary judgment against counterclaimant Pollock Ford Co., Inc. (Pollock) filed August 15, 2000; third-party defendant Ford Motor Company, Inc.'s (Ford) motion for summary judgment against third-party plaintiff Pollock filed August 15, 2000; and third-party plaintiff Pollock's motion for partial summary judgment against third-party defendant Ford filed August 15, 2000.

## FACTS

In 1989, Sam Pollock, owner of Pollock Motor Car Company, Inc., which in turn, owned

1

Pollock, entered into an agreement with Charles Craft by which Craft would take a 49%

ownership interest in Pollock Motor Car Co., Inc., assume a substantial debt guarantee, and

become directly involved in the management of the Pollock dealerships.  The dealerships

included a Buick dealership, a Nissan dealership, and the Gadsden, Alabama Ford dealership in

question.  All dealerships, including the Ford dealership, were experiencing financial and

operational difficulties.  In 1991, when the difficulties had not improved after two years, Sam

Pollock sold the remaining 51% interest in Pollock Motor Car Co., Inc. to Craft and left the

business altogether.[1]  Prior to 1991, Sam Pollock had been the "dealer principal" of Pollock.

After he left, Craft was to take control of the Ford dealership as "dealer principal."

Ford markets its vehicles through a network of independent dealerships, each of which

enters into a franchise contract with Ford.  Sam Pollock was a dealer principal under such an

agreement with Ford.  Pursuant to this agreement, whenever a dealer principal proposes to sell a

dealership or to change the dealership's executive management, the new owner and dealer

principal must be approved by Ford.  Ford was unhappy with Craft's operation.[2]  The concern

about Craft's abilities combined with the flagging performance and customer satisfaction

problems of the Gadsden Ford dealership in recent years led Ford to negotiate a new limited-term

franchise contract with Craft in 1993.

The new agreement limited the term of the franchise to two years, expiring March 1,

---

[1]  At oral argument on October 6, Pollock's attorney stated that, in 1991, Mr. Pollock and Mr. Craft closed the Ford dealership for a time because it was losing money.  It is not necessary for the court to consider what effect, if any, this had on the franchise agreement in existence at that time.

[2]  Craft had, in the past, operated steel plating companies, served as chairman of a local bank, and owned and presided over a real estate firm and an investment firm, but had not owned and operated an automobile dealership prior to operating the Pollock dealerships.

2

1995. In addition to the franchise contract, Pollock agreed to certain conditions precedent to renewing the franchise contract which are contained in a "Letter of Understanding," dated January 29, 1993. The Letter of Understanding is not incorporated as such by reference in the actual franchise contract. However, the Letter of Understanding does reference the proposed new franchise agreement. The conditions precedent centered on Pollock's improving its performance in certain key areas.

Several letters memorialize the fragile relationship between Ford and Pollock. After Pollock agreed to the new limited term franchise in 1993, Ford sent Pollock a letter, dated August 8, 1994, that itemized certain areas in which Pollock was failing to fulfill its obligations under the Letter of Understanding. The alleged areas in which Pollock was deficient were vehicle and parts sales, customer handling, and competent personnel. Ford admonished Pollock to formulate a plan to meet its obligations. At the end of the letter, Ford stated that "should performance deficiencies not be corrected, the Region will consider recommending non-renewal pursuant to the Letter of Understanding dated January 29, 1993." The next letter, dated April 13, 1995, notified Pollock that it was not in compliance with the Letter of Understanding and the Sales and Service Agreement in the areas of vehicle and parts sales, customer handling, and personnel. Ford gave Pollock a 6-month period, from May 1 to October 31, 1995, to cure the deficiencies and warned Pollock that if conditions remained the same, Ford "will consider recommending non-renewal for failure to perform . . . . This notice is provided . . . pursuant to Chapter 20, section 8-20-5 of the Alabama Code." On March 14, 1996, Ford mailed a third letter to Pollock, granting it yet another 6-month extension of time to cure its alleged non-compliance in the same four areas discussed in the prior two letters. This letter was almost identical to the

3

April 13, 1995 letter, except that it threatened Pollock with non-renewal if the deficiencies were not cured by September 30, 1996. Another letter, sent the very same day, extended the date to December 31, 1996. Finally, on March 25, 1997, Pollock received a notice of non-renewal for continuous failure to meet the obligations of the Letter of Understanding in the areas of customer satisfaction/handling, low vehicle and parts sales, and poor personnel. Pollock was given until June 30, 1997, to sell the assets and business to a qualified buyer. On July 1, the relationship with Ford expired, and the plaintiff was no longer authorized to sell Ford vehicles. Pollock remained in possession of the vehicles until Ford eventually repurchased them on October 23, 1997.

Throughout Pollock's relationship with Ford, FMCC, a wholly-owned subsidiary of Ford, had been providing Pollock with wholesale financing for Pollock's systematic acquisition of new and used vehicles (known in the industry as a "floor plan."). In exchange for the financing, Pollock granted FMCC a security interest in the new and used vehicles as well as an assignment of certain accounts receivable, including "all credits due and to become due" from Ford or any of its subsidiaries and affiliates. The security interests were perfected by filing financing statements.

On September 8, 1997, about a month after Pollock's relationship with Ford expired, FMCC declared Pollock to be in default and, pursuant to the security agreement, accelerated all of the sums due and demanded that Pollock immediately pay $2,968,202.12, with interest accumulating every day that the amount remained outstanding.[3] When FMCC initially filed its

_____

[3] Apparently, FMCC could have declared Pollock in default under the security agreements based on the termination of the franchise agreement on July 1, 1997.

4

complaint for detinue and replevin on October 7, the entire amount was outstanding and the

collateral was still in Pollock's possession. FMCC sued for the principal, the interest, attorneys'

fees, and all other costs provided for in the floor plan documents and security agreements. It also

asked for a declaration of its right to take possession of the collateral.[4]

When Ford repurchased the vehicles, it paid FMCC all the money that FMCC claimed.

On January 7, 1999, FMCC moved to dismiss its complaint with prejudice. That motion was

denied, however, because Pollock argued that some of the money that FMCC received from Ford

rightfully belonged to Pollock. On April 9, 1999, this court granted Pollock's subsequent motion

to amend the pleadings to assert a counterclaim and third party claim against FMCC and Ford,

respectively. Pollock filed its counterclaim and third party claim against FMCC and Ford on

May 24, 1999, claiming that Ford had committed unfair and deceptive trade practices that

violated the Alabama Motor Vehicle Franchise Act, Ala. Code § 8-20-1 *et seq*. ("the Alabama

Act") and the Federal Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq*. ("the

Federal Act"). Pollock claims that FMCC had "participated in, consented to, and ratified,"

Ford's conduct in violating the Alabama Act. In addition, Pollock claims that FMCC owed it

$106,188.37, which purportedly represents the additional interest and flat charges that had

accrued after the termination of Ford and Pollock's relationship while the vehicles were in

Pollock's possession. Pollock alleges that the interest had accrued as a result of Ford's failure to

purchase the vehicles before October 23, 1997. Pollock also claims $11,638.59, which

purportedly represents the legal fees incurred by FMCC during the same period. Finally, Pollock

---

[4] The complaint was filed before the previously referenced purchase of October 23, 1997.

5

claims that FMCC defrauded Pollock by representing to it that FMCC would release the security interest in the used car inventory if Pollock paid the balance outstanding on the used car inventory and then refusing to do so after Pollock had paid the balance. Pollock asks the court to order FMCC to provide Pollock with a full accounting of the money paid by Ford to FMCC.

Ford claims that, under the Letter of Understanding, in order to qualify for an extension of the limited-term agreement, Pollock had only to rise above the bottom 25% of comparable Ford dealerships in the area of customer satisfaction. In 1991, after a QC-P survey,[5] the dealership had ranked 22nd out of 23 dealers in customer satisfaction within its "comparative group," and in 1992 it had ranked 33rd out of 34 dealers. According to Ford, in order to comply with the agreement, Pollock's customer service scores had to rise out of the bottom 25% of the comparative group. Ford claims that, according to the agreement, if it remained in the bottom 25% of the customer satisfaction comparative group, Pollock would not be entitled to renew the franchise.

By March 1, 1995, Pollock still had not risen out of the bottom 25% of comparable dealerships in customer satisfaction. Pollock was ranked 39th out of 44 dealerships for the year 1993 and was ranked 77th out of 77 dealerships for the year 1994. Ford did not exercise its contractual right to not renew the franchise, however, and provided Pollock with two "extensions" of the term in order to give Pollock time to cure the defect. After the end of 1996, when Pollock had ranked 53rd out of 58 dealers in customer satisfaction, Ford notified Pollock

---

[5] Customer satisfaction was measured through a process known as "Quality Commitment-Performance" ("QC-P"), in which a third party agency tallies customer satisfaction surveys that Ford customers complete and send to it. The agency then compares the customer satisfaction scores for dealerships in the same comparative group and sends the rankings to Ford and its franchisees.

of its decision not to renew the franchise agreement beyond June 30, 1997.

Pollock claims that Ford did not want the Pollock Ford dealership to survive from the outset of Craft's assumption of the "dealer principal" office. According to Pollock, the limited-term agreement's standards were too high, requiring Pollock to obtain an *overall* QC-P share that would rank Pollock above a *majority* of the Ford dealers in its comparative group and to equal or exceed the average vehicle sales of the other Ford dealers in the region, not simply to rise out of the bottom 25% of comparable dealers in the area of customer service. Pollock alleges that, after 1993, Ford repeatedly sent "threatening, pessimistic and negative correspondence" to Pollock in bad faith because it had always intended to not renew the agreement and was merely laying the groundwork to justify the non-renewal after the fact.

Pollock further claims that Ford allocated and distributed its vehicles to Pollock in an "arbitrary, capricious, and unreasonably discriminatory manner" with the intent to sabotage Pollock's efforts to meet the requirements of the Letter of Understanding. Pollock alleges that Ford refused to distribute to Pollock the number of vehicles necessary to meet its new sales requirements. Throughout these events, Pollock claims, FMCC "participated in, consented to, and ratified" the conduct of Ford.[6]

Pollock further claims that shortly after the agreement finally expired, Craft instructed Ford to retrieve the vehicles. Although Ford eventually paid money to FMCC on Pollock's behalf, Pollock contends that it was not the entire amount required under the Alabama Act. In addition, Pollock claims that FMCC received and withheld from Pollock funds paid by Ford that

---

[6] The court finds no evidence of any action by FMCC other than its acting under its agreements.

were not properly charged to Pollock, specifically, the accrued interest and legal fees.

Pollock alleges that after the Ford-Pollock agreement finally ended, Pollock asked FMCC if FMCC would release its security interest in Pollock's used vehicles if Pollock paid the entire outstanding balance on those vehicles. According to Pollock, FMCC represented that it would indeed release its security interest in the used vehicles if the balance were paid, but refused to do so after it had cashed the check from Pollock. Having relied upon FMCC's alleged representation, Pollock claims, Craft personally had to sell investments and Pollock had to borrow additional funds in order to finance future "floor plans" after FMCC refused to release the security interests on the used vehicles.

## CONTENTIONS OF THE PARTIES

**Counterdefendant FMCC's motion for summary judgment against counterclaimant Pollock**

FMCC argues that it is not liable to Pollock under the Alabama Act because it is not a "manufacturer" under the Act. The term "manufacturer" is defined as "Any person engaged in the manufacturing or assembling of new motor vehicles as a regular business or any person who is controlled by the manufacturer." Ala. Code § 8-20-3(a). FMCC cites to other jurisdictions that, it maintains, have vehicle franchise acts similar to Alabama's but that expressly deny that a floor plan financier can be considered a "manufacturer." Specifically, FMCC cites to Florida's statute, discussed in Palm Springs Dodge, Inc. v. Chrysler Credit Corp., 537 F. Supp. 178 (S.D. Fla. 1982); Indiana's statute, discussed in Ford Motor Credit Co. v. Garner, 688 F. Supp. 435 (N.D. Ind. 1988); and New York's statute, discussed in Chrysler Credit Corp. v. Dioguardi Jeep Eagle, Inc., 596 N.Y.S.2d 230 (N.Y. App. Div. 1993).

8

FMCC further argues that, even if it could be considered to be a manufacturer, it is not responsible for the acts or omissions of Ford.  It argues that Pollock has put forth no evidence showing that FMCC played any role in Ford's relationship with Pollock other than that of financier.  In fact, Craft and his son both testified in their depositions that they had no way of knowing how FMCC participated in the non-renewal.  Craft Depo, p. 183-187; Stephen Craft Depo, p. 112-113.

Pollock maintains that FMCC is indeed a manufacturer under the Alabama Act.  Included in the definition of "manufacturer" is "any person who is controlled by the manufacturer."  Ala. Code § 8-10-3(a).  Pollock asserts that because FMCC is a wholly-owned subsidiary of Ford, it is controlled by Ford.  Pollock argues that the Indiana and Florida statutes that FMCC is using to support its argument that a floor plan financier is not a "manufacturer" are of little value in this case because the narrow definitions of "manufacturer" in those statutes do not include "a person controlled by a manufacturer."  Pollock contends that  because the Alabama statute allows a person controlled by a manufacturer to be deemed a manufacturer, the construction of statutes that do not impute manufacturer status to anyone other than an actual manufacturer should not apply.

Instead, Pollock argues, the Alabama statute is similar to the Federal Automobile Dealers Day in Court Act, 15 U.S.C. §§ 1221-1225.  The Federal Act's definition of "manufacturer" contains the same "control" element that the Alabama Act contains.  The Tenth Circuit has held that the definition of manufacturer includes a wholly-owned subsidiary of the manufacturer whose relationship with dealers exists in order to facilitate the distribution of automobiles manufactured by the parent.  Colonial Ford, Inc. v. Ford Motor Co., 592 F.2d 1126, 1129 (10th

Cir. 1979).  Applying the definition to FMCC, the court found that because FMCC's

involvement with the dealer existed to facilitate the distribution of automobiles manufactured by

Ford, FMCC is a "manufacturer" as a matter of law.  Id.  In Palm Springs Dodge, Inc. v. Chrysler

Credit Corp., 537 F. Supp. 178, 180 (S.D. Fla. 1982), the district court, relying in part on

Colonial Ford, found that a material issue of fact existed as to whether the finance company was

under the "control" of the manufacturer.  Although the court in Palm Springs Dodge did not find

that the finance company, a wholly-owned subsidiary of the manufacturer, was, as a matter of

law, under sufficient control to be automatically considered a manufacturer, it did find that the

plaintiff should be given the opportunity to prove the requisite control to a jury.  Id.  Pollock

argues that FMCC should be held to be a manufacturer as a matter of law because it is a wholly-

owned subsidiary of Ford and its relationship with Pollock facilitated the distribution of Ford's

vehicles.  In the alternative, Pollock contends that it should have the opportunity to prove to a

jury that FMCC meets the "control" requirement.  Pollock also argues that it does not need to

show specific instances in which FMCC acted in concert with Ford or in some apparent way

ratified Ford's conduct.  Pollock maintains that simply being under the control of Ford is

sufficient to make FMCC equally liable for the acts and omissions of Ford, regardless of whether

they performed the acts together.[7]

　　　FMCC next argues that it is not liable for promissory fraud.[8]  Pollock claims that FMCC

---

[7] As indicated elsewhere herein, plaintiff has now acknowledged that it does not fault FMCC for the
termination of its franchise.  The court does not agree that FMCC can be held liable for the conduct of Ford merely
because it is arguable that, for some purposes, it may be considered a "manufacturer."  As elsewhere herein stated,
the court concludes that FMCC acted under only its own agreements.

[8] The elements of fraud in Alabama are: (1) false representation; (2) of a material fact; (3) upon which the
plaintiff reasonably relied; (4) resultant damages.  Foremost Ins. Co. v. Parham, 693 So. 2d 409, 422 (Ala. 1997).

represented to Pollock that it would release its security interests in the used vehicle inventory if
Pollock paid the balance of the used vehicle floor plan.  Pollock alleges that the representation
was false and that FMCC made the representation with, among other levels of knowledge and
intent, the knowledge that the statement was false and with the intent that Pollock rely on the
statement.  The specific statements allegedly were made during a telephone conversation
between Craft and a representative from FMCC named Logan.  Craft allegedly asked if FMCC
would be willing to release the liens on the used vehicles if Pollock paid the balance of the used
vehicle floor plan.  Craft, depo. p. 119-120, 122-123.  According to Craft, Logan replied "I don't
see a problem with that."  Id. Craft admits that Logan did not definitively say that the liens would
be released.  Nevertheless, Pollock argues that "No problem" could be reasonably understood to
mean "Yes."

FMCC argues that the evidence of the representation that Pollock has presented is
insufficient for the claim to survive summary judgment.  FMCC contends that the statements
upon which Pollock relies are not sufficiently certain and definite to be a representation upon
which a reasonable person would rely.  FMCC cites to Kaye v. Cawnee Construction Co. for the
proposition that if there is reason to doubt the truth of an alleged representation or become
informed of the truth before taking action, reliance upon the statement is not reasonable.  680
F.2d 1360, 1367 (11th Cir. 1982) citing Bedwell Lumber Co. v. T&T Corp., 386 So. 2d 413, 415
(Ala. 1980).  According to FMCC, "I don't see a problem with that" is such a statement.  FMCC

---

Promissory fraud plaintiffs must prove two additional elements: (a) the misrepresentation was made with the present
intent to deceive and (b) at the time of the misrepresentation, the defendant intended not to perform.  Standard
Furniture Mfg. Co. v. Reed, 572 So.2d 389, 391 (Ala. 1990).

11

also asserts that the plaintiff has not produced sufficient evidence that FMCC intended to deceive Pollock at the time that the alleged statement was made.

Pollock argues that questions of fact preclude summary judgment on the fraud claim. Pollock contends that a fraud claim can survive summary judgment for lack of reasonable reliance if the plaintiff submits substantial evidence of misrepresentation. Fisher v. JMIC Life Ins. Co., 697 So. 2d 57, 59 (Ala. Civ. App. 1997). Pollock claims that substantial evidence of misrepresentation may be shown by testimony of conflicting oral representations. It points to the conflict in the testimony of Craft, who testified that Logan told him that releasing the lien would be "no problem" and that of Logan, who testified that he made no representations that there would be "no problem," but instead said, "Let me check on it and I'll call you back." Craft, depo. p. 119-120; Logan, depo. p. 76. Logan further testified that, immediately after talking with Craft, he called one of Pollock's prospective lenders and informed him that FMCC "could not release any UCC filings." Logan, depo. p. 76. Pollock claims that, in addition to providing the substantial evidence of misrepresentation needed to overcome an assertion of lack of reasonable reliance, the conflicting testimony also provides evidence of FMCC's present intent to deceive Pollock into paying the balance on the used car floor plan.

Finally, FMCC argues that Pollock's claim for an accounting is moot and that it is entitled to summary judgment on Pollock's claim for "money had and received." First, FMCC argues that Pollock's accounting claim is moot because Pollock has already received an accounting from FMCC. FMCC points to Craft's deposition in which he testified that Pollock has received two accountings from FMCC that detail the amount that Pollock allegedly owed FMCC. Next, FMCC argues that it is entitled to summary judgment on Pollock's claim for

12

"money had and received" in the form of the interest and attorneys fees that accumulated
between the non-renewal and the collection of the vehicles. Pollock claims that the money,
$106,188.37 in interest plus $11,638.59 in attorneys' fees, should be returned to it because it was
accumulated by Ford's unreasonable delay in repurchasing the vehicles after the non-renewal.
FMCC argues that Pollock is bound by the security agreements and promissory notes executed to
finance the floor plans. The security documents state that, in the event of default, FMCC is
entitled to receive the outstanding principal with interest as well as reasonable attorneys' fees.
FMCC argues that it is entitled to receive not only the interest and $11,638.59 in attorneys' fees
already accumulated prior to the counterclaim, but also additional attorneys' fees for defending
Pollock's counterclaim.

Pollock contends that the accountings that FMCC has already provided are not "full" or
"proper" accountings. According to Pollock, the accountings consisted only of a page of
numbers, with no explanation of how they were derived. Pollock's definition of an accounting
includes an explanation of how the numbers were derived and all work papers utilized in
generating the accounting.

Regarding the "money had and received" claim, Pollock argues that a question of fact
exists as to whether the Alabama Act has been violated. After it claimed the vehicles on October
23, Ford paid FMCC the balance plus the outstanding interest and attorney's fees. Pollock
argues that because the repurchase of the vehicles occurred 90 days after the day that Pollock
alleges that it "tendered" the vehicles to Ford, FMCC should give Pollock any of the funds that
Ford paid to FMCC that accrued as a result of Ford's unreasonable delay.

**Third party defendant Ford's motion for summary judgment against third party plaintiff**

13

**Pollock**

Ford argues that it is entitled to summary judgment for all of Pollock's unfair trade practice claims concerning the Letter of Understanding and the 1993 limited term agreement because those claims are barred by the statute of limitations.  The claims that seem to refer to the 1993 agreement documents, found in Count One of Pollock's complaint, are:

> "(a)    by coercing or attempting to coerce Pollock to do acts prejudicial to Pollock . . . .
>
> (g)    by offering a renewal, replacement or succeeding franchise or dealer agreement containing terms and provisions the effect of which was to substantially change or modify the sales and service obligations of Pollock other than as permitted by the Alabama Motor Vehicle Franchise Act.
>
> (h)    by refusing to give effect to the sale of stock by Sam B. Pollock, Jr. to Craft without imposing unreasonable and arbitrary conditions upon the parties."

Pollock also claims in Count Five of the complaint that Ford violated the Federal Act by "failing to act in good faith in performing and complying with the terms and provisions of the franchise, or in terminating or not renewing the franchise with Pollock."

Ford contends that Pollock's claims concerning the 1993 agreement documents are barred by the applicable statutes of limitation.   Ford argues that the statute of limitations under the Alabama Act runs for four years. Ala. Code. § 8-20-12.  Ford also notes that the statute of limitations under the Federal Act runs for three years. 15 U.S.C. § 1223.

Further, Ford interprets the first allegation, that it coerced Pollock to do acts prejudicial to Pollock, as implying that Ford's conduct in negotiating the 1993 agreements was unlawfully coercive.  Ford asserts that the statute of limitations for duress begins to run at the time of the alleged duress, in this case, the signing of the 1993 agreements. Burns v. Sealy Ins. Agency, 545 So.2d 763, 765 (Ala. 1989). Ford also argues that as a seasoned businessman, Craft has had

14

sufficient experience in negotiating and entering business agreements so as to prevent his being

coerced into an unconscionable agreement.  It asserts that Pollock's allegations that it was

coerced into entering into the agreement are contradicted by Craft's own deposition testimony.

The following is an excerpt from the Craft deposition:

> Q: Were there any threats made to force you to sign this
> agreement?
> A: I don't think he ever threatened me.

Craft, depo. p. 79.

> Q: Leo Warner [the Ford representative who negotiated with
> Pollock] never told you that you had to sign this or Ford would
> take away the franchise, did he?
> A: No, I don't remember him specifically saying that, no.  But in
> my opinion that was the only thing I could do was sign that.
> Q: Leo Warner never told you that you didn't have any option other than
> signing this, did he?
> A: I don't know that he told me or not.  I don't remember him saying that.

Craft, depo. p. 209-211.

> Q: Was there any part of this agreement that you did not understand before
> signing it?
> A: I'll assume not.  I signed it.

Pollock argues that its claims regarding the 1993 agreement documents matured within

the applicable statutes of limitation period.  Although Pollock acknowledges that any duress

allegedly applied to coerce Craft to sign the agreement and Letter of Understanding occurred in

1993, it urges the court to follow the Tenth Circuit's guidance in Colonial Ford, Inc. v. Ford

Motor Company, 577 F.2d 106 (10th Cir. 1978).  In Colonial Ford, the court found that although

the statute of limitations had run, the alleged coercive acts of the defendants "were of such a

nature that the damages could not have been ascertained until an extended period of time had

elapsed." Id. at 112.  The court found that while the conduct had occurred outside the limitations

period, the "action for damages" accrued within the limitations period.  Id.  Pollock contends

that, although the alleged coercion occurred in 1993, Pollock did not feel the damage of those

acts until Ford refused to renew its franchise pursuant to the allegedly overly-strict standards of

the limited term agreement and the Letter of Understanding.  At the very least, Pollock argues,

evidence of coercion in obtaining Craft's signature on the Letter of Understanding can support a

claim for bad faith under the Federal Act.

Next, Ford argues that it had good cause to refuse to renew the franchise agreement with

Pollock.  It claims that according to the franchise contract, to qualify for an extension of the

limited term agreement, "Pollock needed only to climb out of the bottom 25% of dealers in its

QC-P group [in customer satisfaction]" and that failure to do so would be grounds for not

extending the agreement.  Because the QC-P results show that Pollock failed to climb out of the

bottom 25%, Ford claims that Pollock "fail[ed] to provide adequate customer satisfaction."  Ford

also claims that its decision was in "good faith," which the Alabama Act defines as "honesty in

fact and the observation of reasonable commercial standards of fair dealing."  Ala. Code § 8-20-

3(7).  Ford has provided citations to a host of cases from other jurisdictions that have upheld a

manufacturer's right to terminate or not renew dealers for "substandard customer service among

other performance deficiencies."

Pollock, however, has called into question the very bases upon which Ford's decisions

rest.  In answer to Ford's argument that the "franchise agreement" allowed it to refuse to renew

the agreement in the event that Pollock failed adequately to improve its customer satisfaction,

Pollock points to the fact that this particular contingency is found not in the body of the actual

franchise agreement, but in the Letter of Understanding that Craft signed prior to signing the

franchise agreement.  Pollock argues that the Letter of Understanding is "a legal nullity" that

does not affect the rights and duties of the parties as articulated in the franchise agreement.

Pollock provides several reasons for its assertion that the Letter of Understanding is irrelevant to

the contractual relationship.  First, Pollock argues that because the letter is not referenced

anywhere within the franchise agreement, it cannot modify the terms of the agreement.  Pollock

notes that the franchise agreement incorporates by reference the <u>Ford Sales and Service</u>

<u>Agreement Standard Provisions</u>, which state that:

> "This agreement terminates and supersedes all other agreements concerning the
> dealership operations and constitutes the entire agreement between the parties with
> respect to the subject matter thereof.  Each party acknowledges that, except as expressly
> set forth herein, no representation, understanding or presumption of law or fact has been
> made or relied upon (1) which has induced the execution of this agreement or would in
> any way modify any of its provisions, or (2) with respect to the effectiveness or duration
> of this agreement or the sales or profit expectancy of the dealership operations."

Pollock argues that even though the letter purports to govern the contractual relationship

"notwithstanding Paragraph 26 [of the Standard Provisions]," because it is a prior writing, not

simply collateral to the franchise agreement, but purporting to deal with the requirements for the

operation of the dealership, it cannot form any part of the subsequent franchise contract.  Pollock

cites to <u>Pasquale Food Co. v. L&H International Airmotive, Inc.</u>, 283 So.2d 438, 444 (Ala. Ct.

App. 1973).  Pollock notes that the provisions of a contract are to be construed against the drafter

of the contract.  <u>Southern Energy Homes, Inc. v. Washington</u>, 2000 WL 127184, *5 (Ala. 2000).

It argues that the court should construe the absence of a reference to the Letter of Understanding

in the franchise agreement against Ford and declare the letter to be inapplicable to Pollock's

responsibilities under the franchise agreement[9]. According to Pollock, the franchise agreement does not contain a requirement for a minimum result in a compilation of customer service surveys.

Pollock also argues that the Letter of Understanding is contrary to Alabama public policy as well as violative of the Alabama Act, § 8-20-4(3)m, which defines as an unfair trade practice a manufacturer's assenting to a release, waiver, or estoppel which:

> "would relieve any person from any liability or obligation under this chapter or to require any controversy between a new motor vehicle dealer and a manufacturer to be referred to any person other than the duly constituted courts of this state or the United States, if the referral would be binding on the new motor vehicle dealer."

Additionally, Pollock argues that the Letter of Understanding violates three other sections of the Alabama Act: §§ 8-20-4(1)c.; (3)d.; and (3)f.  Subsection (1)c. prohibits a manufacturer from requiring a dealer to enter into an agreement the effect of which is to cancel or fail to renew any already existing dealer agreement.  Subsection (3)d. prohibits a manufacturer from failing to extend the franchise agreement other than as provided by the termination section, § 8-20-5. Subsection (3)f. prohibits a manufacturer from offering a replacement agreement containing terms or provisions the effect of which substantially changes or modifies sales and service obligations.  The provisions of §§ 8-20-4 and 8-20-5 apply "notwithstanding the terms, provisions, or conditions of any dealer agreement or franchise or the terms or provisions of any waiver." §§ 8-20-4 and 8-20-5(a)-(b).

Pollock further argues that being in the bottom 25% of comparable dealers in the isolated

---

[9] As indicated elsewhere herein, the court rejects this argument because of language in the contemporaneous Letter of Understanding.

area of customer service does not constitute the failure "to substantially comply with the reasonable performance provisions of the franchise" needed for a manufacturer to prove good cause for termination of the franchise agreement pursuant to § 8-20-5(b)(2). Because the specific requirement that Pollock climb above the bottom 25% of dealers in customer service is found not in the actual franchise agreement but in the Letter of Understanding, Pollock argues that it falls outside the purview of the statute. To demonstrate that remaining in the bottom 25% of comparable dealers in the area of customer service alone does not equal a failure to perform a reasonable performance provision, Pollock also highlights Ford's answer to one of Pollock's interrogatories in which Ford states that it does not terminate dealers solely based on QC-P ratings and has not terminated any dealer solely for poor customer service between 1991 and 1997. Finally, Pollock contends that the QC-P survey process is flawed and is easily manipulated. Pollock notes that Ford no longer uses the QC-P method to evaluate its dealerships' performances. Pollock has presented evidence in the form of expert testimony regarding the fallibility of the QC-P process.

Ford contends that, contrary to Pollock's arguments, the Letter of Understanding is an enforceable part of the franchise agreement. First, Ford argues that the Letter of Understanding, while clearly dated January 29, 1993, a date prior to that of the execution of the franchise agreement on March 3, 1993, was *executed* by Ford on March 11, 1993, a short time *after* the execution of the franchise agreement. Next, Ford argues that the term "franchise agreement" as defined at § 8-20-3(1) can encompass a number of documents that define the rights and duties of the parties. Ford contends that it does not matter that the franchise agreement does not refer to the Letter of Understanding because the Letter of Understanding incorporates by reference the

19

franchise agreement.  Ford cites in support <u>Morrer v. Tensaw Land & Timber Co.</u>, 20 So. 2d 105,

107 (Ala. 1944)("It is well settled that two writings connected by reference one to the other, or

simultaneously made with respect to the same subject matter and proved to be parts of an entire

transaction constitute but a single contract as if embodied in one instrument.") and <u>K&C</u>

<u>Development Corp. v. AmSouth Bank</u>, 597 So. 2d 671, 674 (Ala. 1992)("documents need not be

executed contemporaneously in order to be construed together, as long as the documents refer to

one another.").  Ford does not argue that the franchise agreement refers to the Letter of

Understanding, but that the Letter of Understanding refers to the franchise agreement.

Ford also argues that whether the Letter of Understanding violates public policy or the

Alabama Motor Vehicle Act is a nonissue because Ford is not attempting to enforce any of the

specific provisions of the Letter of Understanding that Pollock claims violate public policy or the

Alabama Act.  Ford does not directly address Pollock's argument that the Letter of

Understanding by its very existence violates the Alabama Act, §§ 8-20-4(1)c.; (3)d.; and (3)f.

and that by attempting to enforce the letter, Ford is indeed attempting to enforce the violative

provisions.  Ford also argues that the requirement that Pollock climb out of the bottom 25% of

comparable dealers in customer satisfaction does constitute a "reasonable performance

provision" under the Alabama Act and that Pollock, by failing to do so, failed substantially to

comply with the provision.  Ford argues that the QC-P is a reliable measure of dealer

performance and was properly used to evaluate Pollock.

Ford further contends that it did not refuse to renew the franchise agreement with Pollock

solely because of Pollock's alleged poor customer service.  It points to the failure notices and the

termination notice which purport to discipline Pollock and terminate the franchise because of

20

poor vehicle and part sales and incompetent personnel as well as poor customer service. Ford claims, however, that had it terminated Pollock solely for poor customer service, good cause still would exist under the Alabama Act. Therefore, for purposes of its summary judgment motion, Ford argues, it need only show that no issue of material fact exists as to whether Pollock failed to perform the franchise agreement's alleged requirements in the area of customer service.

Next, Ford argues that its actions were lawful and in good faith under the Federal Act. It asserts that a Federal Act claim requires proof of coercion, intimidation, or threats of coercion or intimidation, citing Carroll Kenworth Truck Sales v. Kenworth Truck Co., 781 F.2d 1520, 1525 (11th Cir. 1986). Pollock responds that it has presented evidence of Ford's representative coercing Craft to sign the Letter of Understanding. Craft has testified on deposition that Ford demanded that the legal structure of dealership ownership be changed after Craft had assumed control of the dealership. Pollock has presented documentary evidence that Ford knew that it had allegedly missed a statutory deadline to disapprove Craft's ownership of the franchise. Pollock has presented Craft's testimony as evidence that although Ford knew that it had no statutory authority to challenge Craft's ownership of the franchise, it nevertheless threatened to somehow "disapprove" Craft's ownership if Craft did not sign the Letter of understanding and the limited term agreement.

Regarding the repurchase of the vehicles, Ford argues that its repurchase of the vehicles complied with the Alabama Act's requirement in § 8-20-5(i) that allowed Ford ninety days in which to retrieve the vehicles. Ford argues that the ninety-day period did not start to run until Pollock "tendered" the vehicles to Ford and that Pollock did not tender the vehicles to Ford until sometime in August. Ford contends that, pursuant to the statute, Pollock must prove that it

21

tendered the vehicles to Ford more than ninety days before October 23, 1997, the day that Ford actually claimed the vehicles.  Ford asserts that Pollock cannot prove that it tendered the vehicles to Ford prior to August.

Craft admits that immediately after the franchise relationship terminated, Ford called Pollock and asked to repurchase the vehicles.  Ford claims that Pollock refused to tender the vehicles at that time.  Pollock claims that it tendered the vehicles to Ford within a week after the relationship terminated, but that Ford conditioned the repurchase upon Craft's signing a general release, which Craft referred to as a "hold harmless agreement."  Pollock alleges that when Craft refused to sign the release, Ford refused to repurchase the vehicles.  Pollock contends that because there is nothing in the Alabama Act that allows Ford to require a general release in order to repurchase a dealer's inventory, Craft's refusal to sign the release did not negate his original tender of the vehicles.  Craft testified in his deposition that Ford was requested to repurchase the cars.  Craft's son testified that at least one such conversation occurred within one week of the expiration of the franchise agreement.  Pollock argues that this evidence is sufficient to establish a prima facie case against Ford for failure to timely repurchase the vehicles.

Ford initially argued that Pollock's claims are not properly raised in a third-party complaint and should be dismissed.  It has now withdrawn this argument.

**Third-party plaintiff Pollock's motion for partial summary judgment against third-party defendant Ford**

Pollock moves for partial summary judgment on its third-party complaint against Ford. First, Pollock asserts that the procedure that Ford used when it refused to renew the limited-term agreement violated the Alabama Act.  Pollock refers to §§ 8-20-4(2)d. and e., which provide that

22

it is an unfair or deceptive trade practice to terminate or to refuse to extend a franchise agreement other than through the procedures prescribed in the act. Section 8-20-5(a) provides that, notwithstanding any terms in the agreement to the contrary, a manufacturer must comply with a notice requirement, act in good faith, and have good cause in order to terminate or to refuse to renew a franchise agreement. In fact, if challenged, the manufacturer has the burden to show good faith, proper notice, and good cause. § 8-20-5(c). The notification procedures, a prerequisite for the necessary good cause, require the manufacturer in most cases to simply give the dealer notice "pursuant to the requirements of this section" within 180 days of receiving actual knowledge of a failure of the dealer to comply with a provision of the franchise agreement. § 8-20-5 (b)(1). The provision must be "reasonable and of material significance to the franchise relationship." Id. If the alleged failure "relates to the performance of the dealer in sales or service," the manufacturer has good cause to terminate the relationship only if it follows more detailed notice provisions. § 8-20-5(b)(2). It must provide written notice to the dealer *of the failure*, state within the notice that notice is being provided pursuant to the provisions of the Alabama Act, and afford the dealer at least six months to cure the failure. § 8-20-5(b)(2)a.1.-2. If the dealer does not cure the defect within the cure period, the manufacturer can terminate the relationship by following the termination notice procedures prescribed in §8-20-5(d). However, the failure must still have been present within 180 days of the notice of termination. § 8-20-5(b)(2)b.

Pollock brings its motion for partial summary judgment solely on failure of notice. Pollock argues that Ford's notices of failure and termination were fatally flawed as a matter of law because they did not strictly comply with the statute. First, Pollock argues that, according to

23

§ 8-20-5(b)(1), Ford was required to provide Pollock with notice *of its failures* within 180 days

of receiving actual knowledge of the failure. According to Pollock, because the failures alleged

by Ford relate to sales and service performance, notice must also be given in accordance with the

heightened notice provisions of § 8-20-5(b)(2). The first notice of failure that Ford sent to

Pollock is dated August 8, 1994. Although it is in writing, it does not reference the statute and

does not provide Pollock with a "cure period."[10] Pollock argues that because it does not conform

to the statute, it is not effective as a statutory notice. The next notice that Ford sent to Pollock,

alleging the same failures as in the August 8 letter, is dated April 13, 1995. This notice appears

to comply with the statute; it is written, it references the statute, and provides a six-month cure

period. Pollock asserts that the August 8, 1994 letter is evidence that Ford had actual knowledge

of Pollock's alleged failures at that time. Pollock then argues that because Ford did not send a

conforming failure notice until April 13, 1995, well over 180 days after the August 8 letter, the

notice fails pursuant to § 8-20-5(b)(1). Pollock argues that because Ford did not send Pollock a

conforming notice of the failures for which it refused to renew the relationship within 180 days

of receiving actual knowledge of the failures, it can never have good cause to not renew the

relationship based on those specific failures. According to Pollock, with respect to the failures

for which Ford refused to renew the franchise agreement, Ford must "forever hold its peace."

Pollock also interprets § 8-20-5(b)(2)b. as requiring the manufacturer to send the dealer notice of

termination within 180 days of the end of the cure period. Pollock argues that because Ford gave

Pollock successive cure periods, it did not terminate the relationship in the manner required by

---

[10]  It is not clear from the face of the statute whether the failure notice itself must extend the opportunity
for a cure period in order to comply with the statute.

the act. Pollock concludes that because Ford's notices did not conform to the procedural requirements of the statute and because conformity with the requirements is a prerequisite for good cause to terminate, Pollock deserves summary judgment in its favor on the issue of whether Ford had good cause to refuse to renew the franchise agreement.

Ford argues that it satisfied the procedural requirements of the Alabama Act. It argues that §§ 8-10-5(b)(1) and 8-20-5(b)(2) are two separate notice provisions that do not affect each other. They contain two different definitions of "good cause" for terminations related to two different kinds of failures. According to Ford, if the alleged failures are of material significance to the franchise agreement *but do not relate to sales or service*, the heightened notice requirements found in § 8-20-5(b)(2) that provide for a specific *notice of failure* need not be followed. The manufacturer may simply provide *notice of termination* according to the provisions in § 8-20-5(d), as long as the notice of termination is provided within 180 days of the alleged failure. Ford contends that if, however, the alleged failures relate to sales or service, the manufacturer must follow the provisions of § 8- 20-5(b)(2) and provide a very specific notice of failure and a cure period. If the failures are not cured, Ford argues, the manufacturer is authorized to terminate the relationship by following the notice of termination procedure in § 8-20-5(d). Ford maintains that the difference in §§ 8-20-5(b)(1) and 8-20-5(b)(2) reflect the differences in the failures that they address. According to Ford, § 8-20-5(b)(1) addresses discrete acts that occur in isolation and are committed on particular dates. Failures in sales and service, Ford contends, are ongoing failures that cannot be assigned to a particular date and require time to evaluate. Ford argues that it is logical to provide a 180-day deadline for a manufacturer to terminate a dealer for a discrete act that violated a material provision of the franchise, but that it

25

would be illogical to require a manufacturer either to act within 180 days of learning of an amorphous, ongoing failure in sales or service or to be forever shackled to a dealer that is continuously performing poorly in those areas.

Ford argues that if the statute is read properly, it is obvious that Ford complied with the necessary notice procedures. Ford maintains that the April 13, 1995 letter conforms to the statutory requirement. Ford notes that it provided Pollock with a six-month cure period, followed by more statutory notice in the form of the March 14, 1996 letter and another six-month cure period. According to Ford, the alleged failures were ongoing when Ford sent the notice of termination pursuant to § 8-20-5(d).[11]

## FURTHER COMMENTS OF PARTIES

After the court had prepared the foregoing, it gave the parties an opportunity to comment thereon and conducted a recorded oral argument on October 6, 2000. The court will note the submitted comments of the parties and partially respond thereto.

### Pollock

The court notes that Pollock has acknowledged that the dealership was not profitable in 1991 and that Sam Pollock and Craft had even contemplated closing it. This suggests that thhe knew that there was already something wrong with the operation. Pollock claims that Craft (not a party to this action) relied on Ford's <u>verbal</u> approval (through King) of him as dealer/owner if <u>he</u> purchased the shares of Sam Pollock. Plaintiff asserts that after Craft purchased the stock, he

---

[11] The court rejects Pollock's inadequate notice argument and will not further discuss it. Further, the court does not now decide whether, even assuming that the notice was inadequate, Pollock has waived the notice requirement or is estopped to assert it because of its participation in the repurchase of the vehicles, etc. by Ford.

26

had a dispute with Mr. Warner, Ford's new Regional Manager.  There is no evidence that Craft

was approved, in writing, as a dealer/owner prior to 1993.

Pollock also asserts that Craft had been approved for transfer of the franchise agreement

"as a matter of law."  The authority that Pollock has cited for this proposition is <u>Bayview Buick-</u>

<u>GMC Truck, Inc. v. General Motors Corp.</u>, 597 So.2d 887 (Fla. Dist. Ct. App. 1992).  Unlike the

Alabama act, however[12], which controls here, the Florida Statute considered in <u>Bayview</u>, Fla.

Stat. §320.643(1) reads in part as follows:

> "(1) A motor vehicle dealer shall not transfer, assign, or sell a franchise agreement
> to another person unless the dealer first notifies the licensee of the dealer's
> decision to make such transfer, by written notice setting forth the prospective
> transferee's name, address, financial qualification, and business experience during
> the previous 5 years. The licensee shall, in writing, within 60 days after receipt of
> such notice, inform the dealer either of the licensee's approval of the transfer,
> assignment, or sale or of the unacceptability of the proposed transferee, setting
> forth the material reasons for the rejection. <u>If the licensee does not so inform the</u>
> <u>dealer within the 60-day period, its approval of the proposed transfer is deemed</u>
> <u>granted</u>."

(emphasis added).[13]

Likely more pertinent to this action is Fla. Stat. § 320.644(1) which reads in part as

_____

[12]  The Alabama Act, at the time that the new agreement was negotiated and signed between the parties,
did not contain such approval language.  <u>See</u> Ala. Code § 8-20-4(3)i., k. (1993).  The Act has recently been
amended to include an operation of law clause similar to that of Florida's clause, governing the manufacturer's
exercise of its right of first refusal.  <u>See</u> Ala. Code § 8-20-4(3)k.2. (2000).  That it is included now in the area of
right of first refusal nevertheless is inapplicable to the facts of this case.  However, the specificity of the new
operation of law language further supports this court's finding that the Alabama Legislature did not intend for a
lapse of the 60-day period provided for in § 8-20-4(3)k. to bring about approval as an operation of law.

[13]  The Florida Act refers to the manufacturer as the "licensee."  This is somewhat confusing, if one
considers the relationship between a manufacturer and a dealer.  That the term "licensee" refers to the manufacturer
(the franchisor) as opposed to the dealer (the franchisee) in this instance is supported by the Florida Act's
requirement that automobile manufacturers be licensed by the state. Fla. Stat. § 320.61. The Florida Act defines
"licensee" as "any person licensed or required to be licensed under § 320.61" in Fla. Stat. § 320.60.  Section 320.61
specifically states that the term "licensee" will be used to refer to the manufacturer elsewhere in the Act as
necessary.  Further, the specific use of the term "dealer" throughout the statute when referring to the dealer supports
the conclusion that "licensee" refers to a person other than the dealer.

follows:

> "(1) No licensee shall prohibit or prevent, or attempt to prohibit or prevent, any
> motor vehicle dealer from changing the executive management control of the
> motor vehicle dealer unless the proposed change of executive management control
> of the motor vehicle dealer is to a person or persons not of good moral character
> or who do not meet the written, reasonable, and uniformly applied standards of
> the licensee relating to the business experience of executive management required
> by the licensee of its motor vehicle dealers. A motor vehicle dealer who desires to
> change its executive management control shall notify the licensee by written
> notice, setting forth the name, address, and business experience of the proposed
> executive management. A licensee who receives such notice may, within 60 days
> following such receipt, file with the department a verified complaint for a
> determination that the proposed change of executive management will result in
> executive management control by persons who are not of good moral character or
> who do not meet such licensee's standards. The licensee has the burden of proof
> with respect to all issues raised by such verified complaint. If the licensee fails to
> file such verified complaint within such 60-day period or if the department, after a
> hearing, dismisses the complaint, the franchise agreement between the motor
> vehicle dealer and the licensee shall be deemed amended to incorporate such
> change or amended in accordance with the decision rendered."

Again, these provisions are not in the Alabama Act.  See Ala. Code § 8-20-4(3)i., k.[14]

Pollock apparently argues that Craft did not "agree" to the provisions of the Letter of

Understanding.  The Letter of Understanding contains, inter alia, the following language.

> "I, the undersigned individual, Charles E. Craft, understand that Ford
> Division, Ford Motor Company ("Company"), has reviewed my application on
> behalf of Pollock Ford Co., Inc. ("Dealer"), a corporation formed in Alabama, for
> a Ford Sales and Service Agreement ("Agreement") to operate a Company
> dealership at the premises at 925 Forrest Ave., Gadsden, Alabama, and that the
> Company has certain concerns about my qualifications to be principal of the
> Dealer.
> Accordingly, I, the Dealer and the Company agree as follows"(emphasis
> added):

> "6. OTHER PROVISIONS

---

[14]  At oral argument, Pollock's attorney acknowledged that the Florida Act contains "operation of law"
language that is not in the Alabama Act.

b.  Notwithstanding Paragraph 26 of any Agreement that shall be issued to me or the Dealer, the provisions of this Letter are not intended to be superseded by any such Agreement, shall continue in full force and effect after the execution of any such Agreement by me or the Dealer and the Company, and I hereby ratify and confirm by the Dealer and by the undersigned individually.  If the Dealer is issued Continuing Agreement, this letter shall terminate except as to Paragraph 6(c) of this Letter."

d.  There is attached a certified copy of a resolution of the Board of Directors of the Dealer certifying that the signatory, on behalf of the Dealer, has full power and authority to execute and deliver the Agreement and this Letter.

e.  The parties hereto have reviewed this Letter with legal counsel of their choice."

The Letter of Understanding was effective at least by March 11, 1993 (the date that it was executed by Ford).  The Ford Sales and Service Agreement was executed effective March 3, 1993.  The two agreements were obviously parts of the same contract.  See Ala. Code § 8-20-3(1); see also Moorer v. Tensaw Land & Timber Co., 246 Ala. 223, 226 So.2d 105 (1944).

Pollock further argues that the QC-P ranking was based on a "survey," not a "test" and that there is no evidence that it was objective.  Pollock argues that the survey was invalid because the manner in which it was completed and the results were tallied left room for the dealers to cheat and did not compensate for "non response bias."[15]  Pollock also argues that Ford has since abandoned the QC-P model of determining customer satisfaction for a different method called "Viewpoint."[16] Pollock argues that the Letter of Understanding provision is unreasonable and, therefore, unenforceable.  See Ala. Code 8-20-5(b).

_____

[15]  Pollock has submitted evidence of dealers manipulating the responses of the surveys that the QC-P vendor received in the form of exhibits attached to an expert opinion.

[16]  The evidence shows that Ford changed from QC-P to Viewpoint in 1998.

29

The court notes that the "Letter of Understanding" included the following language:

"2.     CONDITIONS

CUSTOMER SATISFACTION– I understand the reason for issuance of the Term Agreement, as opposed to Continuing Agreement, is that the Company Quality Commitment-Performance ("QC-P") ranking of Pollock Ford Co., Inc. does not meet the company's customer satisfaction qualifications for appointment as a Company dealer.  I understand that providing high levels of customer satisfaction in the areas of vehicle sales and service is vital to the long term success of the Dealer and the Company."

There is no evidence that, as of March 1993, either party had determined the QC-P survey to be questionable, certainly not rising to the level of unreasonableness.  Pollock acquiesced in the standard and did not bring any action pursuant to Ala. Code § 8-20-11.

<u>Ford</u>

Ford notes that the Sales and Service Agreement with Pollock that was in effect prior to 1991 and 1993 provided that "No such change or notice [in ownership or managerial authority] and no assignment of this agreement or of any right or interest herein shall be effective against [Ford] unless and until embodied in an appropriate amendment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer."

Ford further notes that Sam Pollock and Craft had acknowledged this provision in a letter dated August 12, 1991 and that Craft acknowledged it in his Prospective Dealer Application dated April 23, 1991.  Ford denies that it delayed approval of Craft's application to be owner of the dealership.  It further denies that it ever rejected his application, but that the parties agreed to a two-year agreement.  Ford calls attention to paragraph 6(b) of the Letter of Understanding, quoted above.

Ford repeats its argument that the claims of any alleged violations of Alabama law in

30

1993 are barred by Ala. Code § 8-10-12. Ford calls attention to the definition of "good faith" in the Federal Act and asserts that the evidence does not support a claim of bad faith, quoting the language in Craft's deposition.[17]

With respect to the repurchase of the vehicles, Ford argues that Pollock never made an unconditional tender or offer to re-sell the vehicles prior to October 7, 1997.

Ford withdraws its argument that it is not properly subject to a third-party action.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment is to be granted if there is no genuine issue of material fact. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. The evidence of the non-moving party is to be believed, and the court is not to attempt to perform jury functions such as credibility determinations. Id. After considering everything in the record, all permissible inferences are to be drawn in favor of the non-moving party. Clinkscales v. Chevron USA, Inc., 831 F.2d 1565, 1570 (11th Cir. 1987).

When the non-moving party has the burden of proof at trial, it must come forward with sufficient evidence on each element that must be proved. Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). If the evidence is merely colorable or is not significantly probative, summary judgment may be proper. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). Summary judgment is appropriate if on any

---

[17] When the court questioned, at oral argument, whether there was any substantive claim under the Federal Act that was not covered under the Alabama Act, Pollock's counsel responded that if the counts brought under the Alabama Act were combined, they probably would include the count under the Federal Act. The court recognizes that there may be a difference in the statute of limitation analysis.

element there would be insufficient evidence to require submission of the case to a jury. Earley, 907 F.2d at 1080. "The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such circumstances, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 327 106 S. Ct. 2548, 2555 (1986).

## FURTHER DISCUSSION AND CONCLUSIONS OF COURT

### Claims against Ford Motor Credit Corporation

At the recorded oral argument, Pollock acknowledged that it did not base a claim against FMCC on the termination of the franchise agreement. Pollock's only claims against FMCC are (1) that it charged interest and attorneys fees for a period which extended beyond the appropriate time for taking possession of the collateral; (2) that it defrauded Pollock by representing that it would release its security interest in the used vehicles if Pollock paid the balance of the used vehicle floor plan; and (3) that there was not a proper accounting by FMCC.

FMCC declared Pollock's obligations to be in default on or about September 8, 1997.[18] On October 7, 1997, it began this action to recover its collateral. It was paid in full when Ford repurchased the vehicles. The court concludes that there was no unreasonable delay by FMCC in its legal proceeding to collect on the indebtedness and that it is entitled to collect interest and

---

[18] Again, FMCC could have declared Pollock in default under the security agreements based on the termination of the franchise agreement on July 1.

attorneys fees for the period between the termination of the franchise and its being paid in full.

The court further concludes that FMCC cannot be held liable for fraud. Assuming that it is reasonably arguable that Pollock suffered any damage by paying an undisputed debt, the court concludes that it could not reasonably rely on Logan's alleged vague response to Craft's inquiry about releasing the liens on the used vehicles. Compare Kaye v. Pawnee Constr. Co., 680 F.2d 1360 (11th Cir. 1982). Further, there is no evidence that, at the time he allegedly made the statement, Logan intended to the contrary. Further, there is no evidence that Pollock ever made a full, lump sum payment of the "used car debt" prior to full payment by Ford.

With regard to the "accounting," claim, the court will order that FMCC, assuming that it has not already done so, within 20 days provide Pollock with a full accounting of the claimed indebtedness and the payments thereon for the two years which conclude with the final payment. The accounting should state the beginning balance and, at least, summaries by categories of subsequent (1) added debits or charges and (2) payments or credits; leading to the balance at the time of final payment by Ford. After FMCC asserts to the court and to Pollock that it has fully provided such an accounting, Pollock may, within 15 days, assert what deficiencies, if any, it claims. If there is such an assertion, the court will appoint an expert to review the accounting and assess its, her or his charges to the part(ies) deemed to have been at fault either providing or rejecting the accounting. The accounting claim will be severed for trial from any trial which may be required against Ford.

**Claims Against Ford Motor Co., Inc.**

Pollock apparently makes these claims against Ford: (1) coercion in requiring Craft to sign the Letter of Understanding in 1993; (2) refusing to approve Craft as successor to Sam

Pollock (3) substantially changing the Sales and Service Agreement obligations from when Pollock was the principal owner in a fashion not permitted by the Alabama Motor Vehicle Franchise Act; (4) failing to act in good faith under the federal Automobile Dealers' Day in Court Act; (5) invoking an unreasonable requirement of the Letter of Understanding with regard to QC-P; and (6) delaying the repurchase of the vehicles after termination.

Coercion and changing obligations

While it appears that the Letter of Understanding and the new Ford Sales and Service Agreement were the result of negotiations, understandings, and agreements between sophisticated businessmen who obtained legal advice, it is not necessary for the court to reach the merits of these claims.[19] The claims are barred by the acknowledged four year statute of limitations. Ala. Code § 8-20-12. Under Alabama Code § 8-20-11, Pollock could have refused to "accede" to the "arrangement," or could have brought "a civil action in a court of competent jurisdiction in this state to enjoin further violations, to recover damages . . . ." Reaching an agreement or understanding in lieu of a civil action is tantamount to a settlement of the issues, particularly when there was no timely action pursuant to Ala. Code § 8-20-12. Pollock had clearly discovered the facts of any alleged violations in early 1993. The court rejects Pollock's argument that the limitations period did not begin to accrue until Pollock felt the effects of the alleged violation. Compare, Carter v. West Publishing Co., __ F.3d __ 2000 WL 1269692 (11th Cir. 2000); Cruder v. Bank of New York, 957 F.2d 961 (2d Cir. 1992); Lancianese v. Bank of Mt. Hope, 783 F.2d 467 (4th Cir. 1986); Burns v. Sealy Ins. Co., 545 So.2d 763 (Ala. 1989).

---

[19] Interestingly, at the oral argument on October 6, Pollock's attorney stated that Craft refused to sign a release proffered by Ford, saying "He refused to do that as a smart businessman."

Refusal to Approve Craft

The court also concludes that this claim is barred by the statute of limitations for the same reasons discussed immediately above. Even assuming that there was or would have been a violation, Pollock acquiesced in the arrangement for a number of years and did not bring a timely action. Ford gave up an arguable right to totally reject Craft and at least temporarily gave up the right to terminate whatever earlier Pollock franchise agreement that may have been in effect.

Failure to act in good faith

To the extent that Pollock relies on the early 1993 conduct, any such claim is likewise barred by the federal statute of limitation. There is no substantial evidence that Ford acted in bad faith in 1997.

The QC-P requirements

The QC-P requirement was asserted in the 1993 Letter of Understanding. No issue was raised concerning it at the time. There is no reasonable inference that it could have been considered unreasonable at the time of the Letter. While it may have been questionable at the time of termination, it was not unreasonable, under the circumstances, to invoke it. Pollock was not even a marginal comparator. There seems to be little question that Pollock did not meet the QC-P standards provided for in the Letter of Understanding and that it was given reasonable opportunities to comply. The Alabama Act, at § 8-20-5(b)(2) refers to "reasonable performance provisions." There is no evidence to suggest that the provisions, as written, were not deemed reasonable at the time that they were agreed upon by the parties.

Delay in repurchasing vehicles

The court will deny Ford's motion in this regard and set the issue for trial. Apparently

35

there is, at most, 29 days over and above 90 days at issue. See Ala. Code § 8-20-5(i).

**SUMMARY**

The only issue for trial against Ford on December 11, 2000 will be whether plaintiff is entitled to recover any interest or attorneys' fees from Ford based on any delay in repurchasing the vehicles. The court will carefully reconsider the sufficiency of the evidence at trial.

The remaining accounting claim against FMCC will be severed and set for trial, if necessary, after the trial against Ford.

This _19th_ day of _October_ 2000.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**